1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SL ENVIRONMENTAL LAW GROUP, PC**
Kenneth A. Sansone, SBN 319982
Seth D. Mansergh, SBN 274892
175 Chestnut Street
San Francisco, CA 94133
Telephone: (415) 348-8300
smansergh@slenvironment.com
ksansone@slenvironment.com

**KELLEY DRYE & WARREN LLP**
Andrew W. Homer, SBN 259852
7825 Fay Avenue, Suite 200
La Jolla, CA 92037
Telephone: (858) 795-0426
ahomer@kelleydrye.com

Attorneys for Plaintiff Golden State Water Company

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN STATE WATER COMPANY,<br><br>　　　　Plaintiff,<br><br>vs.<br>3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.) E. I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, CORTEVA, INC., DUPONT DE NEMOURS, INC.; AND JOHN DOE DEFENDANTS 1-49,<br>Defendants. | Case No.: 2:20-cv-08897<br><br>**PLAINTIFF GOLDEN STATE WATER COMPANY'S COMPLAINT FOR DAMAGES AND OTHER RELIEF:**<br>**(1) STRICT PRODUCTS LIABILITY (DESIGN DEFECT);**<br>**(2) STRICT PRODUCTS LIABILITY (FAILURE TO WARN);**<br>**(3) TRESPASS;**<br>**(4) PUBLIC AND PRIVATE NUISANCE; and**<br>**(5-8) FRAUDULENT AND VOIDABLE TRANSFER.**<br><br>**WITH DEMAND FOR JURY TRIAL** |

　　　　Plaintiff GOLDEN STATE WATER COMPANY hereby alleges, based on information and belief and investigation of counsel:

I.       SUMMARY OF THE CASE

1.       Plaintiff Golden State Water Company ("<u>Plaintiff</u>") owns and operates water systems that provide drinking water to residents and businesses in 75 communities across the State of California. Plaintiff seeks to recover by this action the substantial costs necessary to protect the public and restore certain of its water supply wells, located in Norwalk and South San Gabriel, California (the "<u>Contaminated Wells</u>"), which are contaminated by perfluorooctanoic acid ("<u>PFOA</u>") and perfluorooctanesulfonic acid ("<u>PFOS</u>"), which are both in a family of chemical compounds known as per- and polyfluoroalkyl substances ("<u>PFAS</u>"). In this Complaint the terms PFOS and PFOA are intended to include those compounds themselves (including all of their salts and ionic states as well as the acid forms of the molecules) and their chemical precursors.

2.       PFOA and PFOS are persistent, toxic, and bioaccumlative compounds when released into the environment. PFOA and PFOS have migrated through the subsurface and into the groundwater, and now contaminate the water pumped from Plaintiff's water supply wells. Because of the risks that PFOA and PFOS pose to human health, the State of California regulates PFOA and PFOS in drinking water at very low levels.

3.       Defendants 3M Company and E.I. du Pont de Nemours and Company ("<u>Old DuPont</u>") (collectively 3M and Old DuPont are referred to as the "<u>Manufacturing Defendants</u>") are major chemical companies that manufactured PFOS and PFOA and knew or reasonably should have known that these harmful compounds would reach groundwater, pollute drinking water supplies, render drinking water unusable and unsafe, and threaten the public health and welfare, as they have done with respect to Plaintiff's water supply.

4.       Plaintiff files this lawsuit to recover compensatory and all other damages, including all necessary funds to compensate Plaintiff for the costs of designing, constructing, installing, operating and maintaining the treatment facilities

and equipment required to remove PFOA and PFOS from its water supply, to ensure that the responsible parties bear such expense, rather than Plaintiff and its ratepayers, and for such other damages or relief the Court may order.

5.      In addition, Plaintiff asserts claims under the former Uniform Fraudulent Transfer Act, formerly California Civil Code Section 3439, *et seq.* ("UFTA") and the superseding Uniform Voidable Transactions Act, California Civil Code Section 3439, *et seq.* ("UVTA"), based on a web of transactions that Old DuPont orchestrated to shield significant assets from the Plaintiff and other creditors.

6.      Old DuPont has known for decades that it faces unprecedented environmental and personal injury liabilities for the PFAS that it released into the environment in numerous parts of the county.  Despite this knowledge, Old DuPont has sought and continues to seek, however possible, to prevent injured water systems like Plaintiff from being able to recover on their eventual judgments.

7.      Old DuPont has sought to limit its PFAS liability by engaging in a series of complex restructuring transactions, including: (i) the "spinoff" of its performance chemicals business (which included Teflon and other products, the manufacture of which involved the use of PFOA and other PFAS) into defendant Chemours; (ii) a purported merger with The Dow Chemical Company ("Old Dow"); (iii) the transfer of Old DuPont's historic assets to other entities, including defendant DuPont de Nemours Inc. ("New DuPont"); and (iv) ultimately, the spin-off of  Old DuPont to a new parent company named Corteva, Inc.  These transactions were all designed to shield billions of dollars in assets from the PFAS liabilities that Old DuPont tried to isolate in Chemours.

8.      Old DuPont also sought to hide critical details of these transactions by burying them in non-public schedules to agreements in an attempt to keep the parties such as the Plaintiff in the dark.  As a result, Old DuPont has shed more than $20 billion in tangible assets as a result of its restructuring efforts and attempted to put

those assets outside of the Plaintiff's reach.  This is the exact type of scheme that the UFTA and UVTA are designed to prevent.

## II.     THE PARTIES

9.     Plaintiff is a water company incorporated in California with its principal place of business in San Dimas, California. Plaintiff owns and operates water systems for the benefit of the public. Plaintiff's business include, among other elements, ownership and operation of drinking water production wells that draw from one or more groundwater aquifers, associated pumping, storage, treatment and distribution facilities and equipment, all of which will be referred to collectively in this Complaint as Plaintiff's "Water System." Plaintiff provides potable water through its Water System to residents and businesses throughout the State of California.

10.     Among other things, Plaintiff's Water System includes the right of Plaintiff to extract and use groundwater for drinking water supplies from its wells. Plaintiff has a significant property interest in the waters it extracts and uses from its wells. The past, present, and continuing contamination of such waters by PFOA and PFOS constitute physical injury to such waters for which Plaintiff is entitled to, and Plaintiff hereby does, seek damages and other appropriate relief.

11.     Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

12.     3M does business throughout the United States, including conducting business in California, and is registered to do business in California.

13.     Defendant E. I. du Pont de Nemours and Company ("Old DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

14.     Old Dupont has done business throughout the United States, including

conducting business in California, and is registered to do business in California.

15.     Defendant The Chemours Company ("<u>Chemours</u>") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours was a wholly-owned subsidiary of Old DuPont.  In July 2015, Old DuPont completed its spin-off of Chemours as a separate public entity.  In connection with the spin-off, Chemours assumed direct liability for DuPont's decades long history of causing widespread PFAS contamination  in California, around the country and indeed the world.

16.     Chemours does business throughout the United States, including conducting business in California, and is registered to do business in California.

17.     Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. ("<u>New DuPont</u>") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

18.     New DuPont does business throughout the United States, including conducting business in California.

19.     Defendant Corteva, Inc. ("<u>Corteva</u>") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut Run Plaza 735, Wilmington, Delaware 19805.

20.     Corteva does business throughout the United States, including conducting business in California, and is registered to do business in California.

## III.    JURISDICTION AND VENUE

21.     This court has jurisdiction over this matter because the Plaintiff is a citizen of a different state from each of the Defendants and the amount in controversy, in excess of interest and costs, exceeds $75,000.

22.     This Court has jurisdiction over the Defendants because, based on information and belief, each is a corporation or other business that has sufficient

minimum contacts in California or otherwise intentionally avails or availed itself of the California market either through the distribution or sale of products containing PFOA and/or PFOS in the State of California or by having a manufacturing, distribution or other facility located in California so as to render the exercise of jurisdiction over it by courts in this State consistent with traditional notions of fair play and substantial justice.

23.     Venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred in this district, and because some or all of the property that is the subject of the action is situated in this district.

## IV.     THE PFAS PROBLEM

24.     PFAS are a family of chemical compounds containing fluorine and carbon atoms.

25.     PFAS have been used for decades in industrial settings and also in the production of thousands of common household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant.

26.     The PFAS family of chemicals are entirely human-made and do not exist in nature

27.     PFOA and PFOS have characteristics that cause extensive and persistent environmental contamination.

28.     Specifically, PFOA and PFOS are persistent, toxic and bioaccumulative as well as mobile.

29.     PFOA and PFOS are mobile in that they are soluble and do not easily adsorb (stick) to soil particles.

30.     PFOA and PFOS are readily transported through the air as well as the soil and into groundwater where they can migrate long distances.

31.     PFOA and PFOS are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water or wastewater.

32.     PFOA and PFOS are thermally, chemically, and biologically stable in the environment and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

33.     Once these PFAS compounds are applied, discharged, disposed of, or otherwise released onto land or into the air, soil, sediments, or water, they migrate through the environment and into groundwater and surface water.

34.     These compounds resist natural degradation and are difficult and costly to remove from soil and water.

35.     PFOA and PFOS bioaccumulate, biopersist, and biomagnify in the food web including in people and other organisms.

36.     Exposure to certain PFAS has been associated with several negative health outcomes in both humans and animals, including but not limited to:

    a.     Altered growth, learning and behavior of infants and older children;

    b.     Lowering a woman's chance of getting pregnant;

    c.     Interference with the body's natural hormones;

    d.     Increased cholesterol levels;

    e.     Modulation of the immune system;

    f.     Increased risk of certain cancers; and

    g.     Increased risk of ulcerative colitis.

37.     Contamination from PFOS and/or PFOA presents a threat to public health and the environment.

38.     In addition to drinking contaminated water, humans can be exposed to PFOA and PFOS through inhalation, ingestion of contaminated food, and dermal contact.

39.     PFOA and PFOS enter the environment from industrial facilities that use PFAS in the manufacture or production of other products.

40.     Releases to land, air and water from industrial sites are known pathways to the environment.

41.     PFOA and PFOS may also enter the environment when released from PFAS-containing consumer and commercial products during their use, and after they have been disposed to landfills or in any other manner.

42.     PFAS compounds may become concentrated in sludge at wastewater treatment facilities ("<u>WWTFs</u>") and septage from septic systems.

43.     Biosolids from sludge at WWTFs and septage from septic systems are often used as soil or soil additives either directly from a WWTF at agricultural sites or in the production of potting soil and similar products commercially available from wholesale or retail sources.

44.     The Manufacturer Defendants have known of health and environmental risks associated with PFAS compounds for decades.

45.     The Manufacturer Defendants' manufacture, distribution and/or sale of PFOS and/or PFOA and/or products containing PFOA and/or PFOS resulted in the release of PFOS and/or PFOA into the environment.

46.     Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, the Manufacturer Defendants knew, foresaw, and/or should have known and/or foreseen that PFOS and/or PFOA would contaminate the environment.

47.     The Manufacturer Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw and/or should have foreseen that their marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use of PFOS and/or PFOA containing materials, including in California, would result in the contamination of the groundwater that is the source of the Plaintiff's drinking water.

48.     The Manufacturer Defendants' products were unreasonably dangerous and the Manufacturer Defendants failed to warn of this danger.

**3M COMPANY'S MANUFACTURE AND DISTRIBUTION OF PFAS**

48.     For most of the past seven decades through the early 2000s, 3M was the primary manufacturer of PFAS chemistry in the United States.

49.     3M is the only known manufacturer of PFOS in the United States.

50.     3M began producing PFOA and PFOS as raw materials or ingredients that it used to produce other products, or that it sold to third parties for use in other products.

51.     3M produced PFAS by electrochemical fluorination beginning in the 1940s.

52.     This process results in a product that contains and/or breaks down into compounds containing PFOS and/or PFOA.

53.     3M went on to market PFAS, and it shipped PFAS to manufacturers, including Old DuPont, throughout the United States, including California.

**OLD DUPONT'S USE AND MANUFACTURE OF PFOA**

54.     Beginning in 1951, Old DuPont began purchasing PFOA from 3M for use in the manufacturing process for Old DuPont's name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

55.     Old DuPont has also used PFAS in other name-brand products such as Stainmaster®.

56.     Although Old DuPont was fully aware that PFOA was a dangerous and toxic chemical for decades, it began producing its own PFAS compounds for use in its manufacturing processes as 3M phased out production of PFOA.

57.     Old DuPont continued to manufacture, use, distribute and sell PFAS until its phase-out in 2015.

## 3M's KNOWLEDGE OF THE DANGERS OF PFAS

58.    In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

59.    3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

60.    By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.

61.    3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills would leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

62.    As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

63.    3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about health effects of PFAS.

64.    3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

65.    By at least 1970, 3M was aware that its PFAS products were hazardous to marine life.

66.    One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

67.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States.

68.    Since PFAS are not naturally occurring in any amount, anywhere on the planet, this finding unquestionably alerted 3M to the probability that its products were

1  a pathway for widespread public exposure to its toxic ingredient—a likelihood that
2  3M considered internally but did not share outside the company.

3         69.    This finding also alerted 3M to the likelihood that PFOA is mobile,
4  persistent, bioaccumulative, and biomagnifying, as those characteristics would explain
5  the ubiquitous presence of PFOA from 3M's products in human blood.

6         70.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to
7  monkeys.

8         71.    In the late 1970s, 3M studied the fate and transport characteristics of
9  PFOS in the environment, including in surface water and biota.

10        72.    A 1979 report drew a direct line between effluent from 3M's Decatur,
11 Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee
12 River.

13        73.    3M resisted calls from its own ecotoxicologists going back to 1979 to
14 perform an ecological risk assessment on PFOS and similar chemicals.

15        74.    3M's own ecotoxicologists continued raising concerns to 3M until at
16 least 1999.

17        75.    In 1983, 3M scientists opined that concerns about PFAS "give rise to
18 legitimate questions about the persistence, accumulation potential, and ecotoxicity of
19 [PFAS] in the environment."

20        76.    In 1984, 3M's internal analyses demonstrated that PFAS were likely
21 bioaccumulating in 3M fluorochemical employees.

22        77.    3M's own employees recognized that 3M was concealing known dangers
23 relating to PFAS. For example, in a 1999 resignation letter, an employee stated that "I
24 can no longer participate in the process that 3M has established for the management of
25 [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility and
26 image over environmental safety."

27

28

78.     In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

79.     On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

80.     On the same day as 3M's phase-out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

81.     In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

82.     3M knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in California.

## OLD DUPONT'S KNOWLEDGE OF THE DANGERS
## OF PFAS AND MOUNTING LIABILITIES

83.     Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several facilities in the United States.

84.     Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and biopersistent in the environment. Old DuPont also knew that it directly emitted and discharged, and continued to emit and discharge, PFOA in large quantities into the environment from its manufacturing plants, such that hundreds of thousands of people had been exposed to its PFOA, including through public and private drinking water supplies.

85. Old DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961.

86. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

87. In 1978, based on information it received from 3M about elevated and persistent fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.

88. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

89. By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

90. Old DuPont did not report this data or the results of its worker health analysis to any government agency or community.

91. The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans bioaccumulate PFOA in their tissue, and that "continued exposure is not tolerable."

92. Not only did Old DuPont know that PFOA bioaccumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

93. In fact, Old DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of internal studies of its own plant workers.

94. While Old DuPont knew about this toxicity danger as early as the 1960s, Old DuPont also was aware that PFAS was capable of contaminating the surrounding environment and causing human exposure.

95.     By late 1981, Old DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources.

96.     By 1984, Old DuPont unquestionably was aware that PFOA is biopersistent.

97.     Old DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water.

98.     After obtaining data on these releases and the resulting contamination near Old DuPont's plant in West Virginia in 1984, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

99.     Old DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

100.    Old DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

101.    During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

102.    They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."

103.    They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

104.    By 2000, Old DuPont's in-house counsel was particularly concerned about the threat of punitive damages resulting from Old DuPont's releases of PFOA at its Washington Works facility in West Virginia.

105.   Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

106.   For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

107.   In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of federal environmental laws.

108.   In 2005, Old DuPont eventually settled the action by agreeing to pay $10.25 million in a civil administrative penalty and to complete $6.25 million in supplemental environmental projects.

109.   The combined settlement resolved eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

110.   Old DuPont also promised to phase out production and use of PFOA by 2015.

111.   EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

112.   Old DuPont and Chemours knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in California.

113.   Also in 2005, Old DuPont settled the class action lawsuit styled *Leach, et al. v. E.I. du Pont de Nemours & Co.*, Civil Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (the "*Leach* Action") filed on behalf of approximately 70,000 individuals with PFOA-contaminated drinking water supplies in Ohio and West Virginia for benefits valued at over $300 million.

114.   Under the terms of the 2005 class action settlement, Old DuPont agreed to fund a panel of independent scientists (the "C8 Science Panel") to conduct whatever studies were necessary to confirm which diseases were linked to class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical monitoring of class members with respect to any diseases linked by the C8 Science Panel to their PFOA exposure. "C-8," a term used internally by DuPont employees, is an alternative name for PFOA.

115.   After 7 years of study and analyses, the C8 Science Panel confirmed that PFOA exposures among class members was linked to several serious human diseases, including two types of cancer.

116.   More than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia following the 2005 settlement in the *Leach* Action and the findings of the C8 Science Panel.

117.   These claims were consolidated in the federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the United States District Court for the Southern District of Ohio.

118.   Between 2015 and 2017, juries in three bellwether trials returned multi-million dollar verdicts against Old DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their cancers.

119.   As discussed below, Old DuPont required that Chemours both directly assume its historical PFAS liabilities, and also indemnify Old DuPont from those liabilities. Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours' consolidated financial position, results of operations or liquidity."

120.   On February 13, 2017, Old DuPont and Chemours agreed to pay $670.7 million to resolve the approximately 3,500 then-pending cases in the Ohio MDL.

## OLD DUPONT'S MULTI-STEP, FRAUDULENT SCHEME
## TO ISOLATE ITS VALUABLE TANGIBLE ASSETS FROM ITS
## PFAS LIABILITIES AND HINDER CREDITORS

121.   By 2013, Old DuPont knew that it faced substantial environmental and other liabilities arising from its use of PFOA at Washington Works alone, as well as liability related to PFAS contamination at other sites and areas throughout the country, and that its liability was likely billions of dollars.

122.   These liabilities include clean-up costs, remediation obligations, tort damages, natural resource damages and, most importantly, likely massive and potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

123.   In light of this significant exposure, upon information and belief, by 2013, Old DuPont's management began to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm and personal injuries that Old DuPont's PFAS and associated conduct caused, and to shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

124.   Upon information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures. In or about 2013, Old DuPont and Old Dow began discussions about a possible "merger of equals."

125.   Upon information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS liabilities that Old DuPont faced.

126.   Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy

liabilities from its valuable tangible assets in order to shield those assets from creditors, and entice Old Dow to pursue the proposed merger.

127.   Old DuPont engaged in a three-part restructuring plan, further explained below.

128.   The first step in Old DuPont's plan was to transfer its Performance Chemicals business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) into its wholly-owned subsidiary, Chemours.  And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

129.   Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume.  Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

130.   Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades of illicit and illegal conduct with regard to PFAS.

131.   The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly-formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

132.   Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

133.    The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

134.   The third step involved DowDuPont spinning off two, new, publicly-traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow as a subsidiary. DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

135.   As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

136.   New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

137.   Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Upon information and belief, Old DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like Plaintiff, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

**V.    Step 1: The Chemours Spinoff**

138.   In February 2014, Old DuPont formed Chemours as a wholly-owned subsidiary. Chemours was originally incorporated on February 18, 2014 under the name "Performance Operations, LLC."

139.   On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

140.   Prior to July 1, 2015, Chemours was a wholly-owned subsidiary of Old DuPont. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals business, and Chemours became a separate, publicly traded entity (the "Chemours Spinoff").

141.   At the time of the spinoff, the Performance Chemicals business consisted of Old DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments (the "Performance Chemicals Business").

142.   The Performance Chemicals Business included the fluoroproducts and chemical solutions businesses that had manufactured, used, and discharged PFOA into the environment.

143.   Prior to the Chemours Spinoff, Chemours was a wholly-owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

144.   On June 19, 2015, a fourth member of the Board was appointed, and upon information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

145.   On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and to fill the vacancies created thereby, seven new members were appointed.

146.   To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

147.   Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

148.   Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all of the assets that Old DuPont deemed to be part of the Performance Chemicals Business would be transferred to Chemours.

149.   At the same time, Chemours accepted a broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the nature, probable maximum loss value, and anticipated

timing of the liabilities that Chemours assumed are set forth in non-public schedules and exhibits to the Chemours Separation Agreement.

150.   Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

151.   Thus, in total, Chemours distributed $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

152.   Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, and Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours transferred almost $7 billion in stock, cash and notes to Old Dupont and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. And, Chemours assumed billions of dollars of Old Dupont's PFAS and other liabilities.

153.   In addition to the assumption of such liabilities, the Chemours Separation Agreement required Chemours to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

154.   The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the

Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting PFOA into the environment from Washington Works and elsewhere.

155.   The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

156.   The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Spinoff if they were "primarily associated" with the Performance Chemicals Business.

157.   Chemours also agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

158.   Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS liabilities were properly estimated, and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time of the Chemours Spinoff.

159.   There was no meaningful, arms-length negotiation of the Separation Agreement.

160.   In its Delaware lawsuit, Chemours alleges that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

161.   Although Chemours had a separate board of directors, Old DuPont employees controlled the Chemours board. Indeed, when the Chemours Separation Agreement was signed, Chemours was a wholly-owned subsidiary of Old DuPont, and the Chemours board consisted of three Old DuPont employees and one former, long-standing member of the Old DuPont board.

162.   Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

163.   It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

164.   Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

165.   Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

166.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion.  At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding total net worth of $130 million.

167.    Removing Chemours' goodwill and other intangibles of $176 million yields tangible net worth of *negative* $46 million (that is, Chemours' liabilities were greater than its tangible assets).  According to unaudited *pro forma* financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Chemours Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.

168.    Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours also had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

169.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be tens of billions of dollars.

170.    Had Chemours taken the full extent of Old DuPont's legacy liabilities into account, as it should have done, it would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

## VI.   Step 2: The Old Dow/Old DuPont "Merger"

171.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it

had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

172.   Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

173.   Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

174.   On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger").  The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly-traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

175.   To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for: (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc, *i.e.*, "New DuPont," and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

176.   Upon the closing of the DowDuPont Merger, Old Dow merged into one merger subsidiary, and Old DuPont merged into the other merger subsidiary. Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly-owned subsidiaries of DowDuPont.

177.   Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont (*i.e.*, New DuPont).

178.   The below image reflects the corporate organization following the "merger":



**VII.   Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow**

179.   Following the Dow-DuPont Merger, DowDuPont (*i.e.*, New DuPont) underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

180.   While, again, the details of these transactions remain hidden from the Plaintiff and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial PFAS liabilities. The significant internal reorganization instituted by DowDuPont (*i.e.*, New DuPont) was in preparation for the conglomerate being split into three separate, publicly-traded companies.

181.   Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont (*i.e.*, New DuPont), which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business"; (ii) the "Specialty Products Business"; and (iii) the "Material Sciences Business."

182.   While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont (*i.e.*, New DuPont), for far less than the assets were worth.

183.   Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont (*i.e.*, New DuPont) incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business; and

1  (ii) New Dow, which became the parent holding company of Old Dow, and which

2  holds the Materials Science Business. DowDuPont (*i.e.*, New DuPont) retained the

3  Specialty Products Business, and prepared to spin off Corteva and New Dow into

4  separate, publicly traded companies.

5       184.   The below graph depicts the structure of DowDuPont after the internal

6  reorganization and realignment:



19  **VIII.**

20       185.   The mechanics of the separations are governed by the April 1, 2019

21  Separation and Distribution Agreement among Corteva, New Dow and DowDuPont

22  (*i.e.*, New DuPont) (the "DowDuPont Separation Agreement").

23       186.   The Dow DuPont Separation Agreement generally allocates the assets

24  primarily related to the respective business divisions to Corteva (Agriculture

25  Business), New Dow (Materials Science Business) and New DuPont (Specialty

26  Products Business), respectively.  New DuPont also retained several "non-core"

27  business segments and product lines that once belonged to Old DuPont.

28

187.   Similarly, Corteva, New Dow and New DuPont each retained the liabilities primarily related to the business divisions that they retained, *i.e.*: (i) Corteva retained and assumed the liabilities related to the Agriculture Business; (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business; and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

188.   Corteva and New DuPont also assumed direct financial liability of Old DuPont that was *not* related to the Agriculture, Material Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a *pro rata* basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

189.   This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals business, including Plaintiff's claims in this case.

190.   While New DuPont and Corteva have buried the details in non-public schedules, upon information and belief, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. Plaintiff can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of Plaintiff's Water System.

191.   The separation of New Dow was completed on or about April 1, 2019, when DowDuPont (*i.e.*, New DuPont) distributed all of New Dow's common stock to DowDuPont stockholders as a *pro rata* dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

192.   On or about May 2, 2019, DowDuPont (*i.e.*, New DuPont) consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it

"contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont (*i.e.*, New DuPont) spun off Corteva as an independent public company.

193.   Corteva now holds 100% of the outstanding common stock of Old DuPont.  Corteva now trades on the NYSE under the stock ticker "CTVA."

194.   The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont (*i.e.*, New DuPont) stockholders as a *pro rata* dividend.

195.   The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below:



**IX.**

196.   Also, on or about June 1, 2019, DowDuPont changed its registered name to Du Pont de Nemours Inc. (*i.e.,* New DuPont).

**X.    The Effect of the Years-Long Scheme To Defraud PLAINTIFF and Other**

**Creditors and Avoid Financial Responsibility for Legacy Liabilities**

197.   The net results of these transactions was to strip away valuable tangible assets from Old DuPont, and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

198.   Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer *tangible* assets than it had prior to the restructuring.

199.   In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

200.   For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Corteva separation, however, Old DuPont reported a net loss of *negative* $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

201.   Additionally, Old DuPont reported a significant decrease in Income From Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of *negative* $422 million.

202.   The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

203.   That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

204.   As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

205.   At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was *negative* $644 million.

206.   Old DuPont's financial condition has continued to deteriorate. By fiscal year ended 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

207.   Old DuPont's tangible net worth between September 30, 2019 and December 31, 2019 declined even further, whereby Old DuPont ended fiscal year 2019 with tangible net worth of *negative* $1.125 billion.

208.   In addition, Plaintiff cannot take comfort in the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical PFAS liabilities. And it is far from clear that either entity will be able to satisfy any judgment in this case.

209.   Indeed, New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

210. New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

211. In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

212. On or about December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion.

213. In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

214. In addition, New DuPont has issued Notices of Intent to Sell relating to: six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

215. Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly-owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

## A.    FIRST CAUSE OF ACTION
### (Strict Product Liability Based On Defective Design)

217. Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

218. The Manufacturing Defendants were engaged in the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, and/or selling PFOS and/or PFOA and/or products containing PFOS and/or PFOA, resulting in contamination of the

1   environment, including the groundwater that serves as a water source for Plaintiff's

2   Water System, thereby causing damage to Plaintiff.

3       219.   The Manufacturing Defendants' PFAS products were defective in

4   design and formulation when they left the hands of the Manufacturing Defendants.

5       220.   When used in a foreseeable manner, Defendants' products resulted in

6   the spillage, discharge, disposal, and/or release of PFOA and/or PFOS resulting in

7   contamination of groundwater.

8       221.   At all times relevant to this action, the Manufacturing Defendants'

9   PFOA and/or PFOS and products that contain PFOA and/or PFOS were defective

10  and dangerous to an extent beyond that which would be contemplated by the

11  ordinary consumer, and/or the benefit of the presence of PFOA and PFOS, if any,

12  did not outweigh the risk of harm to public health and welfare and the environment

13  posed by the presence of PFOA and PFOS.

14      222.   As a result of the Manufacturing Defendants' products, Plaintiff has

15  incurred, and will continue to incur, investigation, sampling, treatment system

16  design, acquisition, installation, operations and maintenance, and other costs and

17  damages related to the Contaminated Wells within its Water System.

18      223.   As a direct and proximate result of the defects previously described,

19  Plaintiff's Contaminated Wells, Water System ,and the groundwaters that supply

20  them have been, and continue to be, contaminated with PFOA and/or PFOS, causing

21  physical damage to such groundwaters and causing Plaintiff significant injury and

22  property damage. Restoration, repair and/or remediation of the property damage

23  alleged herein has required Plaintiff, and will continue to require Plaintiff, to incur

24  substantial costs and expenses in an amount to be proved at trial.

25      224.   The Manufacturing Defendants are strictly, jointly, and severally liable

26  for the damages described in this Complaint.

27      225.   The Manufacturing Defendants knew and/or should have known that it

28  was substantially certain that their alleged acts and omissions described in this

Complaint would cause injury and damage, including contamination of Plaintiff's Water System with PFOA and PFOS. The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS and/or products that contain PFOA and/or PFOS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including Plaintiff's Water System. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

**B.     SECOND CAUSE OF ACTION**

**(Strict Products Liability Based On Failure To Warn)**

226.    Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

227.    The Manufacturing Defendants were engaged in the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, and/or selling PFOA, PFOS and/or products that contain PFOA and/or PFOS.

228.    The Manufacturing Defendants represented, asserted, claimed, and warranted that PFOA and PFOS and products containing PFOA and PFOS and/or their precursors did not require any different or special handling or precautions to prevent risk and damage to human health and the environment.

229.    Products containing PFOA and PFOS manufactured and/or supplied by the Manufacturing Defendants are defective and unreasonably dangerous products.

230.    The Manufacturing Defendants failed to provide adequate or effective warnings of the risks of PFOA and PFOS, and/or products containing PFOA and PFOS and/or their precursors, to users, consumer, intermediaries, regulators, and any other party that could have effectively reduced the risk of harm related to using

PFOA and/or PFOS and products that contain PFOA and/or PFOS, of the products' character and the care required to use and dispose of the products safely.

231.   PFOA and PFOS and/or products containing PFOA and PFOS, manufactured and/or supplied by the Manufacturing Defendants, were used in a manner in which they were foreseeably intended to be used.

232.   As a direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, Plaintiff has suffered monetary losses and damages in amounts to be proven at trial.

233.   The Manufacturing Defendants are strictly, jointly, and severally liable for the damages described above.

234.   The Manufacturing Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of drinking water supplies with PFOA and PFOS. The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS and/or products that contain PFOA and/or PFOS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including Plaintiff's Water System. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

## C.    THIRD CAUSE OF ACTION

### (Continuing Trespass)

235.   Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

236.   Plaintiff is the owner and actual possessor of its Water System, which includes the Contaminated Wells that draw groundwater from one or more aquifers.

237.   Plaintiff owns, possesses, and actively exercises rights to extract and use groundwater drawn from the Contaminated Wells.

238.   The Manufacturing Defendants were engaged in the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, and/or selling PFOS, PFOA and/or products that contain PFOS and/or PFOA and knew or should have known that the subsequent and foreseeable use and disposal of those compounds and products would contaminate the groundwater and drinking water supply wells. Thus, the Manufacturing Defendants intentionally, recklessly, or negligently caused noxious and hazardous contaminants and pollutants to enter the groundwater and drinking water supply, including that operated by Plaintiff.

239.   PFOA and PFOS manufactured and/or supplied by the Manufacturing Defendants continues to be located on or in Plaintiff's property and the groundwater that supplies water to the Contaminated Wells.

240.   Plaintiff did not and does not consent to the trespass alleged herein. The Manufacturing Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

241.   The contamination of Plaintiff's water and wells alleged herein has not yet ceased. PFOA and PFOS continues to migrate into and enter Plaintiff's Contaminated Wells and Water System.

242.   As a direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, Plaintiff's Contaminated Wells, Water System, and the groundwaters that supply them have been, and continue to be, contaminated with PFOA and PFOS, causing Plaintiff significant injury and damage. As a direct and proximate result of these Manufacturing Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation and monitoring costs and expenses related to the

contamination of Plaintiff's Water System and Contaminated Wells in an amount to be proved at trial.

243.   The Manufacturing Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of drinking water supplies with PFOA and PFOS. The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS and/or products that contain PFOA and/or PFOS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including Plaintiff's Water System. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

### D.   FOURTH CAUSE OF ACTION
### (Public and Private Nuisance)

244.   Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

245.   Plaintiff is the owner of land, easements and water rights which permit it to extract groundwater for use in its Water System.

246.   The actions of the Manufacturing Defendants as alleged herein, have resulted in the continuing contamination of Plaintiff's Contaminated Wells, Water System and the groundwaters that supply them by PFOA and PFOS, and constitute a nuisance. Each Defendant has caused, maintained, assisted, and/or participated in such nuisance, and is a substantial contributor to such nuisance.

247.   The actions of the Manufacturing Defendants constitute a nuisance in that the contamination of groundwater and drinking water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiff's

free use of its property, so as to interfere with the comfortable enjoyment of life or property. The contamination of the groundwater and public drinking water supply significantly affects, at the same time, a considerable number of people in an entire community.

248.   The Manufacturing Defendants' PFOA and PFOS and products containing PFOA and PFOS are known by the Manufacturing Defendants to contain compounds likely to be discharged to the environment in a manner that will create a nuisance and further failed to properly instruct intermediaries and end-users to properly use and dispose of such contaminants in such a manner that not create or contribute to the creation of a nuisance.

249.   The Manufacturing Defendants knew, or should have known, of the harmful effects and adverse impacts that exposure to PFOA and/or PFOS would have on the environment and human health.

250.   The Manufacturing Defendants caused or contributed to the creation of the nuisance at issue by directing and instructing intermediaries and end users of their products to dispose of products and materials containing PFOA and PFOS in a manner that the Manufacturing Defendants knew or should have known would result in the contamination of soil and groundwater and ultimately impact drinking water.

251.   As a direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, Plaintiff's Contaminated Wells, Water System, and the groundwaters that supply them have been, and continue to be, contaminated with PFOA and PFOS, causing Plaintiff significant injury and damage. As a direct and proximate result of these Manufacturing Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation and monitoring costs and expenses related to the PFOA and PFOS contamination of Plaintiff's Contaminated Wells and Water System in an amount to be proved at trial.

252.   Furthermore, as a direct and proximate result of the Manufacturing Defendants' acts and omissions as alleged herein, the contamination of groundwater and drinking water supplies constitutes an ongoing public nuisance. The Manufacturing Defendants are jointly and severally responsible to take such action as is necessary to abate the public nuisance and to take such action as is necessary to ensure that the PFOA and PFOS that contaminate the aquifers supplying water to the Plaintiff's Water System do not present a risk to the public.

253.   Plaintiff has been specially damaged because the Manufacturing Defendants' acts and omissions, have unreasonably interfered with, and continue to interfere with, Plaintiff's use and enjoyment of its public water supply systems and has suffered and continues to suffer significant damages and injuries, including but not limited to, incurring costs related to the investigation, sampling, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the complete abatement the of the PFAS nuisance the Manufacturing Defendants caused.

254.   The Manufacturing Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of drinking water supplies with PFOA and PFOS. The Manufacturing Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFOA, PFOS and/or products that contain PFOA and/or PFOS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including Plaintiff's Water System. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

# **FIFTH CAUSE OF ACTION**

## **(Actual Fraudulent Transfer in Relation to Chemours Spinoff)**

## **(Old Dupont, Chemours, New DuPont, and Corteva Only)**

255.   Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

256.   Plaintiff seeks equitable and other relief pursuant to the UFTA,  against Old DuPont and Chemours.

257.   Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Chemours Assumed Liabilities").

258.   The Chemours Transfers and Chemours Assumed Liabilities were made for the benefit of Old DuPont.

259.   At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

260.   Old DuPont and Chemours acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

261.   Plaintiff has been harmed as a result of the Chemours Transfers.

262.   Old DuPont and Chemours engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiff that have been damaged as a result of the actions described in this Complaint.

263.   Pursuant to the UFTA and Delaware Code tit. 6 Sec. 1301 to 1312 the Plaintiff seeks to avoid the Chemours Transfers and to recover property or value that Chemours transferred to Old DuPont.

264.   Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

265.   The Plaintiff further reserves such other rights and remedies that may be available to it under the UFTA as may be necessary to fully compensate the Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## SIXTH CAUSE OF ACTION

**(Constructive Fraudulent Transfer In Relation To Chemours Spinoff)**

**(Old Dupont, Chemours, New DuPont, and Corteva Only)**

266.   Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

267.   Plaintiff seeks equitable and other relief pursuant to the UFTA  against Old DuPont and Chemours

268.   Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Assumed Liabilities.

269.   Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

270.   At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours.

271.   Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business and debt obligations.

272.   Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

273.   At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Chemours intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

274.   Plaintiff has been harmed as a result of the Chemours Transfers.

275.   Pursuant the UFTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff seeks to avoid the Transfers and to recover property or value transferred to Old DuPont.

276.   Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

277.   The Plaintiff further reserves such other rights and remedies that may be available to it under the UFTA and UVTA as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## SEVENTH CAUSE OF ACTION

**(Actual Fraudulent Transfer in Relation to Dow-Dupont Merger and Subsequent Restructurings, Asset Transfers And Separations)**

**(Old Dupont, New Dupont And Corteva Only)**

278.   Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

279.   Plaintiff seeks equitable and other relief pursuant to the UVTA , against Old DuPont, New DuPont, and Corteva.

280.   Following the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

281.   The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

282.   At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

283.   Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

284.   Plaintiff has been harmed as a result of the Old DuPont Transfers.

285.   Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiff that have been damaged as a result of the actions described in this Complaint.

286.   Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff seeks to avoid the Transfers and to recover property or value transferred to New DuPont and Corteva.

287.   Pursuant to the UVTA  and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of the Plaintiff.

288.   Plaintiff further reserves such other rights and remedies that may be available to it under the UVTA as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## EIGHTH CAUSE OF ACTION

### (Constructive Fraudulent Transfer in Relation to Dow-Dupont Merger and Subsequent Restructurings, Asset Transfers and Separations)

### (Old Dupont, New Dupont And Corteva Only)

289.   Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

290.   Plaintiff seeks equitable and other relief pursuant to the UVTA , against Old DuPont, New DuPont, and Corteva.

291.   Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

292.   Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

293.   At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

294.   Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

295.   Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

296.   At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

297.   Plaintiff has been harmed as a result of the Old DuPont Transfers.

298.   Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff seeks to avoid the Transfers and to recover property or value transferred to New DuPont and Corteva.

299.   Pursuant to the UVTA and Delaware Code tit. 6 Sec. 1301 to 1312, Plaintiff also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of the Plaintiff.

300.   Plaintiff further reserves such other rights and remedies that may be available to it under the UVTA as may be necessary to fully compensate the Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

# XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a trial of this action before a jury, and that, upon a favorable verdict, this Court enter judgment in favor of Plaintiff and against Defendants, jointly and severally, as follows:

a.    An award of compensatory damages according to proof;

b.    An award of exemplary and punitive damages according to proof;

c.    An order finding the Manufacturing Defendants' actions constitute a nuisance and requiring them to take such action as is necessary to abate the public nuisance in order to ensure that the PFOA and PFOS that contaminate the aquifers supplying water to the Plaintiff's Water System do not present a risk to the public, and awarding damages to Plaintiff caused by the nuisance;

d.    An order that Plaintiff is entitled to void the Chemours Transfers to the extent necessary to satisfy Plaintiff's claims;

e.    An order that Plaintiff is entitled to avoid the Old DuPont Transfers to New DuPont and Corteva to the extent necessary to satisfy Plaintiff's claims;

f.    An order appointing a receiver to take charge of the assets transferred or its proceeds and such other relief the circumstances may require;

g.    An order enjoining New DuPont from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

h.    An order imposing a constructive trust over any such proceeds for the benefit of the Plaintiff;

i.    An award of Plaintiff's costs and fees in prosecuting this action, including reasonable attorneys' fees, together with prejudgment interest to the full extent permitted by law; and

j.    An award of such other further relief as the Court may deem just and proper.

1

**DEMAND FOR JURY**

2          The Plaintiff seeks a trial by jury on all counts and requests for relief in this

3    Complaint.

4    DATED:       September 28, 2020

5                                          **SL ENVIRONMENTAL LAW GROUP, PC**

6
                                           By:  /s/  *Kenneth A. Sansone*
7                                          Kenneth A. Sansone SBN 319982
                                           Seth D. Mansergh SBN 274892
8                                          175 Chestnut Street
9                                          San Francisco, CA 94133
                                           Telephone: (415) 348-8300
10                                         ksansone@slenvironment.com
                                           smansergh@slenvironment.com
11

12

13                                         **KELLEY DRYE & WARREN LLP**

14                                         By:   /s/  *Andrew W. Homer*
                                           Andrew W. Homer SBN 259852
15                                         7825 Fay Avenue, Suite 200
                                           La Jolla, CA 92037
16                                         Telephone: (858) 795-0426
17                                         ahomer@kelleydrye.com

18

19

20

21

22

23

24

25

26

27

28